May it please the Court. My name is Olivia Sanders, and I represent the appellant plaintiff in this case, Terry Cattano. The case has several issues, and what I'd like to do is, first of all, I'd like to ask the Court's permission to reserve three minutes for rebuttal. Certainly. Terry, keep track yourself. Thank you. And there's several issues, but the first issue that I would like to address is the application and the weight given to treating professionals in this case. The second is to address the assessment of Mr. Cattano's credibility as far as his pain testimony and the impact that that would have on his ability to perform in the national economy. And the other is the validity of the vocational expert's testimony in making the disability determination. Mr. Cattano is required to, and we believe does meet the evidentiary burden that his disability existed before December 31, 2007. That is his date last insured, and what that means is that because that's his date last insured, all of his disability evidence must show that that existed prior to that date. If he is not disabled prior to that date, he is not eligible for benefits. There's no other program that can apply to him. It is undisputed that he has the following severe impairments. A multilevel degenerative disc disease, and he's had surgery at the L5, dyssectomy, and a decompression. He also has multilevel degenerative disc disease with stenosis and right radiculopathy. And he had C4, 5, and C6, 7 fusion. He has right shoulder osteoarthritis with impingement, and he has also had surgery on his toes, his toes on both feet. A treating physician's opinion is entitled to great or special weight, because a treating physician has the opportunity to treat the patient and is not seeing the patient strictly for purposes of an evaluation, but also to cure. Mr. Catano has had an ongoing treatment relationship with a treatment facility called Sansum Clinic, and Drs. Conner and Dr. Hamilton have been part of that facility, and they've been treating him since 2003. What happened in this case is the commissioner gave greater weight to two non-examining, file-reviewing consultants, doctors, as well as a one-time consultative. Let's look at those reasons that the ALJ gave for discounting the treating physician's opinion. So you mentioned Dr. Conner, who, as I understand it from the record, correct me if I'm wrong, gave two different contradictory opinions. One earlier in which he said that Mr. Catano could perform light-duty jobs, and then a few years later said that he was disabled. And so what's wrong with the ALJ saying, well, I'm going to go ahead and credit that earlier opinion instead of this subsequent opinion? There was an intervening period of time when Mr. Catano didn't go back to be examined by Dr. Conners, right? One of the things that happens is, and it's been pretty consistent, when a doctor says someone can return to light-duty, Dr. Conner never defined what light-duty was. And so it would be very difficult for an ALJ to then presume that when Dr. Conner says light-duty, that that meant that would be light under what would be considered the dictionary of occupational titles. But didn't Dr. Conner in 2004 say light-job duty that would require minimum bending, lifting and twisting? Yes. So he did give some explanation of what he meant by light-duty, is that right? That is correct. And then he was later inconsistent in 2008, right? Right. And that inconsistency in 2008, if you look at the overall treatment record, there were surgeries performed on Mr. Catano's spine and on the cervical area. And so part of that was the fact that he had had the surgeries, but if you look at the progressive nature of what's gone on, Dr. Conner said that he is going to have more surgeries. So what may have been in 2004, what could be considered an optimistic... Was there surgery between 2004 and the time of Dr. Conner's second report? I'm sorry, what? Was there intervening surgery between his first report in 2004 and the second report in 2008? There was some, like epidurals and things like that in 2007, I believe. So there were other things. In addition to that, there were more treatments that were given. The other thing I think that... What about Dr. Hamilton? Now, Dr. Hamilton was basically what you call a primary care physician, so he would see him periodically. And Dr. Hamilton primarily focused on the fact that, again, he would evaluate him and he said that he suffered consistently from headaches. Was there any indication in the record that Mr. Catano suffered from migraines, you know, during the insured period? Not specifically migraines, what it said is he suffered from headaches. And in the record that he treated with over-the-counter, yeah, medication. Now, in the records, we show on August 6, 2005, the records under the e-degree medical evaluation showed that Mr. Catano suffered from headaches. That's at the administrative record 351. In December 2004, the treating physician who was at that time a Dr. Bruce Acone with the Goleta Valley Chiropractic and Sports Medicine said that he suffered from cervical myospasms, swelling, discogenic headaches and limited range of motion. Discogenic headaches are headaches that arise from the cervical area, which would again indicate how far back those headaches were. One of the things in the ALJ's decision stated that there were no records of headaches. And the record, in fact, contains numerous references to the fact that Mr. Catano had headaches. The other thing that happened in referring to the headaches that, in fact, were nonexistent for the ALJ, the ALJ then said, well, even if there were headaches, they did not contribute to a severe limited range of motion. It's kind of difficult to say something doesn't exist, but if it did, it wouldn't contribute. And so that was part of the ALJ opinion. Well, was that in response to Dr. Hamilton's findings that Mr. Catano was totally disabled, notwithstanding the fact that he was treating him with over-the-counter meds? Well, and we talked about over-the-counter medications. He had not only over-the-counter medications. At times, Mr. Catano was being treated with different medications. For example, let's see, in 2003, he was being treated with flexerol and Vicodin for pain, and that's in ER 273. And at the time, and I guess one of the difficulties is because we've seen this, him get progressively worse over time. When he appeared for his 2012 hearing, he indicated to the judge that he was using a spine stimulator, because his pain is so severe, and they wanted to put in a morphine drip. But because it would involve more surgery, he objected to that. So the longitudinal record shows that his condition has been progressively getting worse, as opposed to the fact that in the conclusion of the fact that he was basically had been treated and he was satisfactory. As far as the next, which is the credibility assessment, the commissioner is required to engage in a two-step analysis to clarify the credibility assessment. And Mr. Catano did testify that he suffers from pain, and the medical treatment records show that he complains of pain. The SSR 96-7C changed, and it's now SSR 16-3P. The basic tenets of that doesn't change. In fact, the two-step analysis is again contained in that. The purpose of the change, according to the Social Security Administration, was to clarify the credibility assessment. The administrative law judge stated that Mr. Catano met the first step, which is that he has a condition and evidence have been presented to show that he has a condition which is consistent with his pain or having pain. The next step, which requires, if you don't find malingering, and there was no indication that Mr. Catano is malingering, that there has to be a rejection of the claimant's severity symptoms by clear and convincing reasons. One of the reasons that was given, and the thing that's also supported by SSR 16-3P, is activities of daily living. I think there's been some misconstruing of the activities of daily living. Mr. Catano indicated that, and one of the things was the fact that he puts dishes in the dishwasher. He indicated that he does that. He also indicated that he spends most of the day sleeping. He watches TV. And there was some reference to the fact that he filled out a form that said he could walk two miles or walk a mile. He actually said he could walk a half a mile and he would be extremely exhausted. And that's at ER 240. Given that, the other thing that we're going to address is the fact that, again, if you don't include his headaches, it's very difficult to talk about his daily activities and the pain testimony. Once the administrative law judge made an RFC determination, or residual functional capacity determination, and residual functional capacity is what a person can do in spite of their limitations. The administrative law judge made the residual functional capacity assessment and then states that Mr. Catano's pain symptoms are not credible because they don't match the residual functional capacity. There is no case and there's no loss that says that that's how it's done. It's RFC. It's based on the complete record, including the pain symptoms. The next is the issue with the vocational expert. If you, given the fact that the treating doctors were not considered and given the proper weight, given the omission of headaches as one of the conditions that Mr. Catano suffered, given the fact that the RFC or residual functional capacity did not include pain symptoms, the hypothetical given to the vocational expert was flawed because the vocational expert is required to take that into consideration in assessing jobs. The jobs that were identified by the vocational expert required overhead reaching, constant walking, standing, pushing and pulling. One of the other things that the vocational expert did testify, if Mr. Catano missed more than four days of work a month, there would be no job for him. If he needed to stop and rest every ten minutes or half an hour, there would be no job for him. You want to save the rest of your time? Good morning, your honors, and may it please the court. Daniel Talbert on behalf of the acting commissioner of social security, Nancy A. Berryhill. So as the claimant's counsel pointed out, this is a case that involves a remote date last insured. So we're looking at whether the claimant met his burden to establish that he was disabled between his alleged onset date in December 2003 and his date last insured of December 31st, 2007. Within that roughly four-year period, the claimant had surgeries, which would have been two surgeries for two significant spinal issues, one for the lumbar spine or lower back at the beginning of that period, the other for the cervical spine or neck at the end of that period. And the record shows that both surgeries provided significant relief for the claimant's allegedly disabling symptoms. During that same four-year period, five separate medical source opinions indicated that the claimant was capable of performing a range of light work consistent with the administrative law judge's finding. Therefore, substantial evidence supports the ALJ's decision and the court's referral. Now I want to refer to some of the issues that the claimant's attorney discussed with respect to the treating source opinions, particularly Dr. Hamilton and the issue of headaches. There was a discussion that the administrative law judge said there was no evidence of headaches prior to the date last insured. On page 441 of the administrative record, which is in the ALJ's decision, the ALJ said that there's no significant evidence of headaches prior to the date last insured. And that's a correct statement. The claimant talks about headaches a little bit in August 2005 with Dr. Hamilton for about a one-month period. And Dr. Hamilton sends the claimant for a CT scan that shows sinusitis. Then Dr. Hamilton says, well, maybe he'll have to have his doctor, who looks like might be a neurologist, to consider the headaches. And at the analysis with Dr. Mester, which is on pages 260 to 261 of the administrative record, Dr. Mester notes that the claimant says he has headaches, but he's laughing about it while he's talking about the headaches. He seems fairly euphoric. And Dr. Mester said it doesn't look like the headaches are all that severe. And that's the last reference that I could find to headaches before the date last insured. So on that record, with that limited evidence of headaches for about, he's complaining of them for maybe one month prior to the date last insured. And then he laughs about it while he's talking about them. And the doctor says, well, it doesn't look like they're that serious. That's inconsistent with Dr. Hamilton. And that and the conservative treatment of taking naproxen and a leave for the headaches is inconsistent with Dr. Hamilton's subsequent statement that he's disabled because of the headaches. So I just wanted to point that out and clarify that for the court. With respect to... Over-the-counter drugs necessarily vitiates a finding of total disability. Is that right? I'm sorry, Your Honor. Could you repeat the question? I didn't quite... Yeah, just because you are given over-the-counter meds to treat a particular symptom doesn't mean that you can't be totally disabled, does it? That's not what masonary stands for, is it?  Rollins versus masonary. When the ALJ is looking at a treating source opinion, the ALJ can look at what recommendations that source has made. And this court said in Rollins versus masonary, in looking at the recommendations that that treating source made, that the descriptions and recommendations the doctor had made about Ms. Rollins were not the sort of recommendations you'd expect for saying someone was completely disabled. And we have the same thing with Dr. Hamilton. There's that limited evidence of that. There's the treatment of only Aleve and naproxen for headaches. And that's inconsistent with a statement that he has disabling headaches. Wasn't the statement, though, that he was totally disabled due not only to daily headaches, but also to neck problems and back problems? But I suppose the same argument would hold true, that he was given over-the-counter meds for these. Well, so with that, I mean, it's kind of a different thing with the neck and back impairments. And I would say as far as Dr. Hamilton's opinion on that point goes, Dr. Hamilton was completing a headache questionnaire. That's sort of what the heading on that form was. And Dr. Hamilton's remark at the end that he was, that the claimant, Mr. Catano, was disabled because of back and neck problems, is a very cursory and unexplained statement. And the regulations in this court's case law indicate that ALJs are normally going to give greater weight to an opinion that's explained than one that isn't. But when we look at the neck and back impairments, the ALJ noted that those impairments were treated appropriately and effectively during the relevant period. In December 2003, when the claimant alleges onset of disability, he has some fairly serious, if you look at the records, lumbar spine problems. And that's the time, I believe it was that year that the claimant's attorney noted the claimant was taking Vicodin and Flexerol as more sort of aggressive pain medication. But in January 2004, Dr. Conner said that the claimant had a severe pain in the lumbar spine and noted in subsequent progress notes that the claimant was doing better. And that he had significant relief of the sort of radicular or radiating nerve root related symptoms from that surgery. So surgery was effective. And Dr. Conner then said in August 2004 that the claimant could perform a light duty sort of job, which as Judge Marbley explained, Dr. Conner did sort of explain what that involved. He didn't just say light duty. He said it's a job where he's standing all day and doesn't have to do heavy lifting. And after that opinion in August 2004, the claimant went for a little over three years without any real treatment for any kind of pain, back pain or neck pain or whatever it might be. And he returned to Dr. Conner in, I think it was September of 2007, saying I've been having some neck pain and some right shoulder pain. And Dr. Conner then performs surgery on the cervical spine in December of 2007. And in January 2008, March 2008, Dr. Conner notes that the claimant had significant and at one point he even said dramatic improvement from his symptoms. Again, the radicular symptoms from that spinal impairment. So again, there's significant relief from treatment. And the ALJ reasonably found that that evidence of significant relief was inconsistent with claimant's allegations of continuing disability and with Dr. Conner's 2008 opinion that the claimant was disabled from that pain. On the point of, yes. It says the commission argues that the ALJ correctly discounted the assessment, July assessment, by Dr. Conner in which he stated that Catano could not perform sedentary work because that opinion was contradicted by his contemporaneous treatment notes. Does it anywhere in the ALJ opinion say that? I'm sorry. So what you're reading right now is from the brief, Your Honor? No, what I'm saying is that from my notes I'm reading. Oh, okay. Inconsistent notes. Right. So the question is, did the ALJ talk about, mention that Dr. Conner's 2008 opinion was inconsistent with his contemporaneous treatment notes? I, I believe, I know the ALJ discusses, I'm not sure off the top of my head if there's a part where the ALJ says inconsistent with contemporaneous treatment notes, but the ALJ certainly discusses throughout her decision what Dr. Conner's treatment notes showed. And the ALJ in the prior, the prior ALJ decision, which she incorporated in by reference at the beginning of the 2012 one under review here, in that prior ALJ decision, Administrative Record page 22, the ALJ makes a reference to Dr. Conner's July 2008 opinion and says that appears to be based primarily on the subjective statements of the claimant. And the ALJ notes a lack of documentation of, of a disabling level before 2007. So I, I would point to that reference to showing that the ALJ is considering the contemporaneous treatment notes, but certainly the ALJ's decision shows a consideration of those notes and has a sort of summary of that medical evidence. And I'd point out that Dr. Conner's treatment notes are consistently indicative of improvement with the treatment, with the surgeries. And one interesting, one important thing about the July 2008 opinion that comes after that 2007 surgery is that Dr. Conner's notes following that surgery showed that the treatment was a significant improvement, significant improvements from that treatment. And it was a reasonable finding by the ALJ to decide to give greater weight to both Dr. Conner's 2004 opinion that the claimant could do a light range of work and with those four other medical source opinions covering that relevant period. You know, two examinations from that period and two doctors who are state agency physicians who looked at the longitudinal record from December 2003 through the end of 2007 and looked at that and considered based on his response to treatment and the objective findings in every examination in that record that he could form the range of light work. Now, there's a lot of... Unless we can find a reason to discount Dr. Conner's opinion, that would prevail over some state officials who just look at papers. And the treating physicians assessment is entitled to greater weight unless we can discount it. That's correct, Your Honor. There's sort of a few different factors that ALJs consider when they're looking at medical source opinions and treating versus examining or even non-examining status. That's one factor you consider. And if Dr. Conner examined or treated the claimant and the state agency physicians didn't, that's kind of a point, maybe even a big point, in Dr. Conner's favor. But if the state agency opinions are better explained or if they're more consistent with the record, those are points that go in their favor. And I note that here we have, again, as you pointed out, before, Dr. Conner, a treating source, said in 2004 that the claimant's able to do a range of light work and then the claimant goes three years without any real treatment for the pain. And then when he comes back and says he has other pain, Dr. Conner performs surgery and that successfully relieves a lot of those symptoms. So we have on the one side of the scale Dr. Conner's 2004 opinion, the two examining source opinions, Dr. Smith and Dr. Conner. On the other side of the scale we have Dr. Conner's contradictory later opinion and Dr. Hamilton's totally unexplained opinion that's talking about headaches, even though the evidence of headaches before the date last insured is quite minimal, as the ALJ noted. So the ALJ under Tomasetti versus Astru gets to resolve conflicts in the medical evidence. And that's exactly what she did here. She resolved it in favor of those five from the relevant period that supported non-disability at the light work level. And she resolved it against or rejected the opinions from Dr. Conner in 2008 and 2009. And that's the ALJ's province. That's up to the ALJ to make those factual findings. My friend on the other side also discussed the issue of credibility. And I just wanted to bring up very briefly the subject of the activities of daily living that she was referring to. The ALJ in this case didn't make a finding that the claimant's activities of daily living, minimal that they seem to be reported to be, indicated an ability to work. The issue here is actually that the ALJ is looking at inconsistencies. The ALJ is considering inconsistent statements. And we have testimony from 2009 that the claimant was capable of doing some chores and sitting for up to an hour at a time. And then we have testimony in 2012 that the claimant wasn't doing any chores at all and could only sit for half an hour. And while in an ordinary case we might say, well, of course there's an inconsistency. This is three years later. Maybe what he's doing three years later is different. But let's remember, we're talking about that four-year period from 2003 to December 2007. And the issue is a question of what were his abilities during that period. So if he says one thing in 2009 about what he was doing back then, something else in 2012 about what he was doing back then, the ALJ could reasonably say, well, this later statement is inconsistent, so I'm not going to accept that for a description of his abilities from that four-year period back in 2003 to 2007. So that's, I mean, so I submit the ALJ reasonably made that finding, made a reasonable finding on the, about the claimant's testimony and reviewed the record. But you're saying that the testimony some years later still referenced back to the period under which he was insured? Exactly. It had to, Your Honor. That's the only period that mattered because the claimant had the burden to prove that he became disabled before December 31, 2007. So what this case... You know, I don't find the inconsistencies in the testimony to be nearly as clear as you make them seem. I mean, he pretty much said the same thing. He said that he generally couldn't do them, he was occasionally able to do them, and then later he said he couldn't do them. But the descriptions, it said he tried to do some, but it was only occasionally able to do them. Then later he said he couldn't do them. That's not that much different. Then to say he could sit for a maximum of an hour, that doesn't mean that he could sit regularly for an hour. That that was when he tried to sit, the most he could ever sit was an hour. Well, let's keep in mind also, Your Honor, that the claimant told Dr. Gurdon in 2007 during the relevant period that he could sit for two hours at a time. I would submit that what he's saying in 2007, that he could sit for two hours at a time, is far more probative than what he's trying to remember two to five years later about how long he could sit. And I see that my time is running short, so I'll just, unless there are further questions, I would just summarize that this is a case where the claimant had successful treatment for his impairments during the relevant period. The evidence is consistent with the ALJ's finding of that treatment relieved the allegedly disabling symptoms, and there is significant substantial evidence during that period supporting the ALJ's finding. Therefore, the Commissioner asks the Court to affirm the ALJ's decision. Thank you. Thank you, Your Honor. We ask, based on the evidence that has been presented and based on the record, that the Court remand the case for payment of benefits. And the reason for that is we believe that the Administrative Law Judge committed both of these legal and factual error, just on the areas that we pointed out today. In addition to that, the record has been fully developed. We're talking about a period from 2007 to 2003. There will be no further evidence that would be available in order to determine disability. And based on that and as far as the Garrison case, Garrison v. Colvin is the one that says credit as true. And that's 759 F3 995 at 1016. And we believe that that supports a finding that credit as true and that would be a remand for benefits. Thank you.
judges: Reinhardt, Nguyen, Marbley